# FILED

CIVIL ACTION NO. _____

3:06CV147-C

| | |
|---|---|
| JOHN G. HEINEMANN, individually, and derivatively, as a shareholder of NEW MILLENNIUM REALTY, INC., a North Carolina corporation; HEINEMANN, INC., a North Carolina corporation, and LEAD GENERATION SYSTEMS, INC., a North Carolina corporation, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| KRISTOFFER M. BOSCHELE; NATALIE D. BOSCHELE; BOSCHELE, INC., a North Carolina corporation; YOUR NEW HOME REALTY, INC., a North Carolina corporation; YOUR HOME SUPERSTORE, INC., a North Carolina corporation; GB HOME BUILDERS AT CENTRAL PARK, LLC, a North Carolina limited liability company; GB HOME BUILDERS AT HILTON MEADOWS, LLC, a North Carolina limited liability company; GB HOME BUILDERS AT HOOVER CIRCLE, LLC, a North Carolina limited liability company; GB HOME BUILDERS AT PLAZA PARK, LLC, a North Carolina limited liability company; GB HOME BUILDERS AT WALNUT CREEK, LLC, a North Carolina limited liability company; GB HOME BUILDERS, LLC, a North Carolina limited liability company; RANDY JORDAN; . LU'AYY NAJJAR; LUNAR RESOURCES, INC., a North Carolina corporation; JAKE EMMET; BRIAN KELLY; KEITH KILLION; MELISSA McCAULY; and JOHN DOES NOS. 1-10; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**VERIFIED COMPLAINT**

Plaintiffs JOHN G. HEINEMANN, individually ("Heinemann") and derivatively, as a shareholder of NEW MILLENNIUM REALTY, INC., a North Carolina corporation ("New Millennium"); HEINEMANN, INC., a North Carolina corporation, and LEAD GENERATION SYSTEMS, INC., a North Carolina corporation, complaining of the Defendants KRISTOFFER M. BOSCHELE ("Boschele"), NATALIE D. BOSCHELE ("Natalie Boschele"), BOSCHELE, INC., a North Carolina corporation ("BSI"), YOUR NEW HOME REALTY, INC., a North Carolina corporation ("Your New Home Realty"), Your Home Superstore, Inc., a North Carolina corporation ("YHSI"), GB HOME BUILDERS AT CENTRAL PARK, LLC, a North Carolina limited liability company ("Home Builders  Central Park"); GB HOME BUILDERS AT HILTON MEADOWS, LLC, a North Carolina limited liability company ("Home Builders Hilton Meadows"); GB HOME BUILDERS AT HOOVER CIRCLE, LLC, a North Carolina limited liability company ("Home Builders Hoover"); GB HOME BUILDERS AT PLAZA PARK, LLC, a North Carolina limited liability company ("Home Builders Plaza Park"); GB HOME BUILDERS AT WALNUT CREEK, LLC, a North Carolina limited liability company ("Home Builders Walnut Creek"); GB HOME BUILDERS, LLC, a North Carolina limited liability company ("Home Builders"); RANDY JORDAN ("Jordan"); LU'AYY NAJJAR ("Najjar"), LUNAR RESOURCES, INC., a North Carolina corporation ("LRI"); JAKE EMMET ("Emmet"), BRIAN KELLY ("Kelly"), KEITH KILLION ("Killion"), MELISSA McCAULY ("McCauly"), and JOHN DOES NOS. 1-10 (the "DOES"), alleges as follows :

## NATURE OF THE ACTION

1.      This is an action for damages and injunctive relief to remedy the misconduct of Defendant Kristoffer Boschele ("Boschele") and the other Defendants, who assisted him, in Boschele's betrayal of his mentor in the real estate brokerage business, Plaintiff John G. Heinemann ("Heinemann"). The misconduct of Boschele and his co-Defendants included an outright breach of an executed 2002 shareholders agreement and the wholesale theft of valuable commercial assets belonging individually to Heinemann.

2.      Beginning in 1996, Heinemann, at great effort and expense, conceived and developed many innovative business processes and procedures, sales techniques and advertising, as well as computer software and other intellectual property (collectively the "Trade Secrets") -- all related to the residential real estate brokerage business. The Trade Secrets enabled Heinemann to identify and attract a large volume of potential clients, particularly first time home buyers. As a result, his firms came to earn a large volume of sales commissions.

3.      After mentoring Boschele, who was a beginner in the business, Heinemann eventually entered into a venture with Boschele and Defendant Randy Jordan ("Jordan") through a 2002 shareholder agreement, by which the three became equal shareholders in Defendant New Millennium Home Realty, Inc. ("NMRI"), with Heinemann expressly retaining personal ownership of all the Trade Secrets. The three shareholders also covenanted that they would not engage in competitive businesses. New Millennium, as the three constituted it, had six sales offices and substantial revenues.

4.      Boschele, however, soon engaged in a wholesale breach of the shareholders' agreement and committed outright theft of Heinemann's Trade Secrets and

3

New Millennium's corporate opportunities. Indeed, only weeks after signing the 2002 agreement, Boschele secretly incorporated a "shadow" company, Defendant Your New Home Realty, Inc., eventually using it as a vehicle for the surreptitious, albeit brazen, copying and misappropriations of Heinemann's Trade Secrets as well as New Millennium's corporate opportunities, effectively foreclosing several lucrative markets to New Millennium. Only shortly thereafter, in March, 2003, Boschele arranged for a fraudulent service mark registration application for "Your Home Superstore," the slogan owned by Heinemann and licensed by him to New Millennium. By April 2003, the Defendants were operating at least one "knockoff " real estate brokerage agency -- in Greensboro, North Carolina. And others soon followed.

5. Through a series of machinations, the Defendants then stalled the day of reckoning by maneuvering to financially compromise Heinemann. In mid-2003, Boschele, in a mitigation agreement, promised Heinemann recompense for what the Defendants had already done, and made a proposal for addressing any future use of Heinemann's Trade Secrets. However, as with the shareholder agreement itself (which, like the mitigation agreement, Boschele had fraudulently induced Heinemann into) the compensation called for in the agreement never materialized. Recently, Boschele even flatly told Heinemann, "We have the money for a lawsuit, you don't!" and "f___ the legal matters"

6. By this action, Heinemann seeks damages and equitable relief for the misconduct of Boschele and the other defendants, including, *inter alia*, claims for: (1) fraudulent trademark registration under Section § 38 of the Lanham Act (15 U.S.C § 1120), (2) false designation of origin and false description and representation under § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); (3) trademark dilution under § 43(c) of

4

the Lanham Act (15 U.S.C. § 1125(c)); and concurrent state law claims, including (4) fraud; (5) breach of fiduciary duty; (6) breach of contract; (7) misappropriation of trade secrets; (8) unfair and deceptive trade practices; (9) intentional interference with advantageous business relationships; (10) conversion; (11) corporate waste and mismanagement; and (12) for declaratory and injunctive relief, an accounting, a receivership over all of the involved business enterprises, and the imposition of a constructive trust.

## THE PARTIES

7.      Plaintiff John G. Heinemann ("Heinemann") is a citizen and resident of Collier County, Florida.   2.   Plaintiff New Millennium Realty, Inc. ("New Millennium") which does business as "RealtyPlace," is a North Carolina corporation with its principal office and place of business in Cornelius, North Carolina, which is in the Western District of North Carolina.   New Millennium

8.      Plaintiff Heinemann, Inc., is a North Carolina corporation with its registered office in North Carolina.

9.      Plaintiff Lead Generation Systems, Inc. ("Lead") is a North Carolina corporation with its registered office in North Carolina.   Collectively, Heinemann, Lead and Heinemann, Inc. are referred to as "Heinemann."

10.     Defendant Kristoffer M. Boschele, a/k/a 'Kris Boschele' ("Boschele") is a citizen and resident of North Carolina who does business in various counties within the Western District of North Carolina, and who committed at least some of the various acts and omissions alleged herein within Mecklenburg County, North Carolina.

11.     Defendant Natalie D. Boschele ("Natalie Boschele") is a citizen and resident of North Carolina who does business in various counties within the Western

District of North Carolina, and who committed at least some of the various acts and omissions alleged herein within Mecklenburg County, North Carolina.

12.     Defendant Boschele, Inc. is a North Carolina corporation ("BSI") with its principal office and place of business in Mooresville, North Carolina, who does business and who has committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

13.     Defendant Your New Home Realty, Inc., is a North Carolina corporation ("Your New Home Realty"), with its principal office and place of business in Cornelius, North Carolina, which does business and had committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

14.     Defendant Your Home Superstore, Inc. (" YHSI") is a North Carolina corporation with its principal office and place of business in Mooresville, North Carolina, which has done business and which has committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

15.     Defendant GB Builders at Central Park, LLC ("Home Builders Central Park") is a North Carolina limited liability company with its principal office and place of business in Cornelius, North Carolina and which has done business and committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina

16.     Defendant GB Builders at Hilton Meadows, LLC ("Home Builders Hilton Meadows is a North Carolina limited liability company with its principal office and place

of business in Cornelius, North Carolina, which does business and which has done business and committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

17. Defendant GB Builders at Hoover Circle, LLC ("Home Builders Hoover Circle") is a North Carolina limited liability company with its principal office and place of business in Cornelius, North Carolina, which has done business and committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

18. Defendant GB Builders at Plaza Park, LLC ("Home Builders Plaza Park") is a North Carolina limited liability company with its principal office and place of business in Cornelius, North Carolina, which has done business and committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

19. Defendant GB Builders at Walnut Creek, LLC ("Home Builders Walnut Creek") is a North Carolina limited liability company with its principal office and place of business in Cornelius, North Carolina, which has done business and committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

20. Defendant GB Builders, LLC ("Home Builders") is a North Carolina limited liability company with its principal office and place of business in Cornelius, North Carolina which has done business and committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

7

21.     Defendant Randy Jordan ("Jordan") is a citizen and resident of North Carolina Natalie does business in the Western District of North Carolina. Jordan is named in this action solely because he may have some rights, interests and obligations with respect to certain of the entities described herein.

22.     Defendant Lu'ayy Najjar, a/k/a 'Lu Najjar' ("Najjar") is a citizen and resident of North Carolina who at times material hereto has done business and who committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

23.     Defendant Lunar Resources, Inc. ("LRI") is North Carolina corporation with its principal office and place of business in Charlotte, North Carolina, which has done business and committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

24.     Defendant Jake Emmet ("Emmet") is a citizen and resident of North Carolina who at times material hereto did business in and who committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

25.     Defendant Brian Kelly ("Kelly") is a citizen and resident of Mecklenburg County, North Carolina, who at times material hereto has done business, and who committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

26.     Defendant Keith Killion ("Killion") is a citizen and resident of North Carolina, Natalie who at times material hereto has done business, and who committed at

8

least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

27.     Defendant Melissa McCauly ("McCauly") is a citizen and resident of North Carolina who at times material hereto has done business, and who committed at least some of the various acts and omissions alleged herein within the Western District of North Carolina, including Mecklenburg County, North Carolina.

28.     Defendants John Does Nos. 1-10 (the "Does") are persons or entities whose identities are presently unknown but are expected to be learned through discovery in this cause, who aided and abetted the other Defendants and who participated in at least some of the acts and omissions alleged herein in the Western District of North Carolina. Upon learning the identity of each of the Does, Plaintiffs shall file appropriate notice. Most of the Does are residents and citizens of North Carolina.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, in that it arises under, *inter alia*, 15 U.S.C. §1121 and 28 U.S.C. §1338. This Court has jurisdiction over the state law claims based upon 28 U.S.C. §1367(a).

30.     Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b), in that most – if not all – of the Defendants reside in this District, a substantial part of the events or omissions giving rise to the claims alleged herein occurred within the District, and many of the potential witnesses and records are located within the District.

9

## GENERAL ALLEGATIONS

31.     All conditions precedent to this action have been performed or waived by the Defendants.

## STATEMENT OF MATERIAL FACTS

## RELATIONSHIPS BETWEEN THE PARTIES

32.     Heinemann incorporated Heinemann, Inc. on September 28, 1999, Lead Generation Systems, Inc. on September 16, 1998 and New Millennium on December 28, 2000.  Heinemann has at all times been the sole owner and principal officer of both Heinemann, Inc. and Lead.  New Millennium is a residential real estate broker and sales and marketing company which has a non-exclusive license to Heinemann's intellectual property and trade secrets.  Heinemann utilized Heinemann, Inc. and Lead as his agents to effectuate the licensing of intellectual property and trade secrets that he personally developed and owned, and the collection of other and related fees and income. Hereinafter, such entities, to the extent that they were so utilized by Heinemann, are incorporated in the party designation "Heinemann."

33.     Defendant Jordan owned and operated a residential real estate broker in competition with Heinemann and his broker company in North Carolina.  As a condition to becoming a shareholder in Heinemann's company New Millennium and to gain access to Heinemann's intellectual property and trade secrets in a business venture with Heinemann, Jordan agreed to transfer to Heinemann the intellectual property and trade dress of his company and to transfer the remaining assets of his company to New Millennium.

34.     Defendant Boschele was introduced to the residential real estate business by Heinemann, who paid his salary and for his real estate classes, and also provided him

with daily one-on-one training and access to leads received as a result of advertisements paid for by Heinemann.

35.     Boschele and Natalie Boschele are husband and wife. They incorporated BSI together on November 13, 2000, to receive the monies they received as agents in the sale of residential real estate. BSI did not own any intellectual property.

36.     Plaintiff Heinemann allowed Defendants Boschele and Jordan to became equal shareholders of New Millennium as of December 23, 2002, pursuant to the terms of a Shareholders' Agreement described in more detail below, which provided that the intellectual property used by New Millennium prior to December 23, 2002, was owned solely by Heinemann and was licensed to New Millennium pursuant to a non-exclusive license agreement.

37.     Unknown to Heinemann and Jordan, Defendant Boschele caused Defendant Your New Home Realty, Inc., a North Carolina corporation, a residential real estate broker and sales and marketing company operating in North Carolina to be incorporated on or about January 8, 2003, and also caused Defendant Your Home Superstore, Inc., a North Carolina corporation, and another residential real estate broker and sales and marketing company to be incorporated on or about March 6, 2003. Your New Home Realty, Inc. is now doing business as "Your Home Superstore" in Greensboro, Raleigh and Winston-Salem, North Carolina. Your New Home Realty, Inc. and Your Home Superstore, Inc. are referred to collectively as the "Shadow Corporations."

38.     Without the consent of Heinemann or Jordan pursuant to the Shareholders' Agreement, Boschele set up several other companies involved, directly or indirectly, in the construction of residential real estate in North Carolina, knowing that New

11

Millennium did business with residential real estate developers and builders who would no longer give the larger bonuses received in earlier years or refer business to New Millennium if its owners went into business with those developers and builders. The home building companies set up by Boschele in violation of the Shareholders' Agreement and in conflict with the interests of New Millennium include Defendant GB Builders at Central Park, LLC ("Home Builders Central Park"), incorporated on June 14, 2005, Defendant GB Builders at Hilton Meadows, LLC ("Home Builders Hilton Meadows"), incorporated on June 1, 2005, Defendant GB Builders at Hoover Circle, LLC ("Home Builders Hoover Circle"), incorporated on March 29, 2005, Defendant GB Builders at Plaza Park, LLC ("Home Builders Plaza Park"), incorporated on April 11, 2005, Defendant GB Builders at Walnut Creek, LLC ("Home Builders Walnut Creek"), incorporated on September 24, 2004, Defendant GB Builders, LLC ("Home Builders"), incorporated on May 13, 2004. These entities are referenced collectively as "Boschele's Real Estate Development Companies."

39.    Without the knowledge or approval of the other members of the Board of Directors or shareholders of New Millennium, after Boschele was appointed Director of Operations for New Millennium, he contrived to dominate, control and manipulate New Millennium, for his personal benefit and for the benefit of his wife and his other companies, including the Shadow Companies and the Boschele Real Estate Development Companies.

40.    Defendant Boschele substantially dominates and controls BSI, the Shadow Companies and the Boschele Real Estate Development Companies, which are the mere alter egos of Boschele, utilized by him to benefit him and his wife and in furtherance of the schemes, acts and omissions alleged herein, and through which, as alleged in more

detail below, Boschele and those acting in concert with him, including upon information and belief Natalie Boschele, have unlawfully diverted and misappropriated assets, profits and opportunities rightfully belonging to Plaintiffs.

41.     Defendant Emmet worked for New Millennium as a general manager at one of its locations, and is currently the manager of the Raleigh, North Carolina location of one of Boschele's Shadow Companies called Your New Home Realty d/b/a Your Home Superstore, who has been working in concert with Boschele in furtherance of his schemes, acts and omissions alleged herein.

42.     Defendant Kelly worked for New Millennium as a general manager at one of its locations, is currently the manager of at least one of the locations of Boschele's Shadow Companies called Your New Home Realty d/b/a Your Home Superstore, who has been working in concert with Boschele in furtherance of his schemes, acts and omissions alleged herein.

43.     Defendant Keith Killion ("Killion") is the CFO of New Millennium, hired by Boschele, who unknown to Heinemann and Jordan, was working for Boschele and his other companies prior to joining New Millennium, and who has been working in concert with Boschele in furtherance of his schemes, acts and omissions alleged herein.

44.     Defendant Najjar incorporated Defendant Lunar Resources, Inc. ("LRI") on or about June 15, 2001, and, upon information and belief is the sole officer and director of the corporation and substantially dominates and controls LRI, which is the mere alter ego of Najjar, utilized by him in furtherance of the schemes, acts and omissions alleged herein, and through which, as alleged in more detail below, Najjar has unlawfully diverted assets, profits and opportunities rightfully belonging to New Millennium and Plaintiff.

13

45.     Defendant Melissa McCauly ("McCauly") is an employee or agent of Najjar and/or LRI and only received access to the intellectual property of Heinemann and New Millennium from Najjar and LRI and pursuant to the express understanding between Heinemann and Najjar that the intellectual property and derivative intellectual property would be owned by Heinemann.   According to Najjar, Boschele or his agents paid McCauly to convert the advertisements already prepared for New Millennium using Heinemann's trade secrets and intellectual property.

46.     Defendants John Does Nos. 1-10 (the "Does") are persons or entities whose identities are presently unknown but are expected to be learned through discovery in this cause, who aided and abetted the other Defendants and who participated in at least some of the acts and omissions alleged herein in Mecklenburg County, North Carolina. Upon learning the identity of each of the Does, Plaintiffs shall file appropriate notice. Upon information and belief, most of the Does are residents and citizens of North Carolina.

47.     Given the circumstances of this action, as described herein, it would be futile for Heinemann to make demand on Boschele to institute affirmative action on behalf of New Millennium and against himself and the other Defendants that he controls, is associated with, or is acting in concert with; consequently, Heinemann brings this action derivatively, on behalf of New Millennium, as well as individually, on his own behalf.   In accordance with Rule 23.1, *F.R.C.P.*, (1) Plaintiff Heinemann was a shareholder of New Millennium Realty, Inc. at the time of the transactions described herein, (2) this action does not involve collusion to confer jurisdiction on a court of the United States which it would not otherwise have, and (3) Plaintiff Heinemann made a demand on the only other shareholder and director, Jordan, who declined to take action

against Boschele and others on behalf of New Millennium Realty, Inc., a closely held corporation, for fear of retaliation by Boschele, consequently any other measures taken by Heinemann would have been futile.

### THE INTELLECTUAL PROPERTY AND TRADE SECRETS

48.　　From and after 1994, with great expense, effort, time and skill, Heinemann devised, developed, refined and improved certain proprietary intellectual property, including, *inter alia,* technology, processes, procedures, techniques, software, devices, advertising and marketing methods, techniques, quotes, slogans, and scripts, training and other materials pertaining to a unique approach and method for marketing residential real estate to consumers, particularly first-time home buyers, including but not limited to the following categories:

#### Technical Information and Computer Software

1. The client tracking program
2. The client qualifying program
3. The pipeline tracking program
4. The bill tracking program
5. The goal tracking program
6. The Internal Computer Software requirements
7. Various software programs related to financial information
8. Customer software

#### The Advertising and Marketing Methods and Compilations of Information

1. The knowledge of what does not work in advertising (negative know how)
2. The effectiveness of different advertising methods.
3. The effectiveness of different graphic designs and layouts.
4. The efficiency of different distribution methods for advertising.
5. Proprietary Sales and Marketing Studies and Reports
6. Sales and marketing methodology

#### Business Information

1. The method, style and manor of doing business.

15

2. The information gathered from years of research and development
3. Custom letters and custom forms
4. The forms used to track client status.
5. The forms used to quantify agent efficiency
6. The forms used to conduct business.
7. The forms used to track business.
8. The telephone scripts
9. The telephone spiels
10. The quotes used for the scripts
11. The manager salaries and compensation structure
12. The agent commission splits and other compensation
13. The Training
14. The Strategic business plans
15. The Strategic marketing plans
16. The research done to evaluate outside markets
17. The business model
18. The organizational structure
19. The office equipment and software requirements
20. The capital budget requirements
21. The library of standard Client letters.
22. The vendors and suppliers lists.
23. Marketing and Sales Promotion Plans
24. Proprietary Administrative Information
25. Quality Control Procedures Quality Control Procedures
26. Marketing and Advertising Techniques
27. Conference room layouts
28. Meeting tools
29. Meeting systems
30. Builder books
31. Check off lists
32. Customer booklets
33. Builder comparison spreadsheets
34. Meeting standards
35. Meeting guidelines
36. Meeting procedures

**Processes**

1. The call desk process used to efficiently and effectively field calls from perspective clients.
2. The appointment process used to efficiently and effectively handle appointments.
3. The process used to decode apartment addresses.
4. The process used to get the phone numbers for those addresses.

16

(Collectively, the "Trade Secrets").[1]  If some of the above does not qualify as "Trade Secrets," Heinemann still considers them his intellectual property which cannot be used beyond the parameters of his express consent.

49.    In addition to the Trade Secrets, Heinemann also developed a significant amount of intellectual property to which he has ownership rights, including Heinemann's original vision was to develop systems and processes to make the business as efficient and effective as possible, through testing and evaluation. The end goal was to standardize as much as possible to guaranty uniformity, to facilitate a quick start up time and to insure the repeatability of success.  It took many years and marketing testing to compile and analyze information, particularly about what advertising and marketing methods and techniques were most successful, which was then used to develop and refine the above methods, techniques, and processes, by simplifying or eliminating time consuming or redundant tasks typically associated with the standard practices in real estate. Another goal was to overcome deficiencies in the agent's skills by developing technology to help train them and develop specific tools and systems for them to use.

50.    Some of the processes and custom letters and forms required a significant amount of legal research and approval by the NC REC.  Other processes and slogans required a significant amount of legal research, work with third parties, including accountants, and additional disclosures to clients and training of agents.

51.    Heinemann has taken reasonable measures to protect his Trade Secrets, including but not limited to: (1) restricting access to areas of offices where Trade Secrets were used; (2) having restrictive pass codes on the computers and software; (3) having

---

[1]    Plaintiff shall seek the entry of an appropriate protective order pursuant to the North Carolina Trade Secrets Protection Act, N.C.G.S. §§66-152, et seq., and upon the entry of such order, shall identify more particularly the materials Plaintiff contends are so protected.

independent contractors execute contracts with nondisclosure provisions; (4) having personnel restrict access and require all visitors to sign in upon arrival; (5) restricting Internet access by keeping such access from computers where proprietary software was used; (6) removing all devices on the computers that could be used to copy software; and (7) locking files and computer media on which Trade Secrets were stored.

52.     The Trade Secrets derive independent economic value, actual or potential, from not being general known to, and not being readily ascertainable through proper means by the public. Heinemann's Trade Secrets are valuable to competitors and were developed and refined over a long period of time and at considerable expense.

53.     While retaining ownership of the Trade Secrets personally, Heinemann licensed the Trade Secrets in a series of residential real estate brokerage businesses in and around Charlotte, North Carolina, from and after 1994, culminating in the establishment of New Millennium.

54.     The transactions described herein essentially involve a series of attempts to utilize Heinemann's Trade Secrets for commercial gain, with Heinemann's knowledge and consent as to New Millennium, but without his knowledge or consent concerning the Defendants' other ventures.

55.     In connection with his development and use of the Trade Secrets, Heinemann also developed and began to use the slogan or advertising term "Compare To Rent" in or about 1996.

56.     Through ownership, active participation and licensing, Heinemann was involved in a series of enterprises between 1996 and 2002 always making it clear to all parties involved that he owned all intellectual property and any improvements to that intellectual property during each of which periods, Heinemann further developed, refined

and used the Trade Secrets which included research, analysis, training, marketing, and advertising.

### A. The Beginning of the Heinemann – Boschele Relationship

57.    Boschele initially approached Heinemann while Boschele was a potential home purchaser in or about 1998.

58.    Heinemann thereafter hired Boschele as his personal assistant and protégé, began mentoring Boschele beginning in early 1999, introducing Boschele to the real estate sales industry, assisting Boschele with career options and training, sponsoring Boschele's basic sales agent licensing, providing Boschele with employment and on-the-job training, and eventually permitting Boschele to attain a managerial capacity, all long after Heinemann had conceived and had developed the core aspects of all or most of the Trade Secrets

59.    From approximately 1999 through 2002, Heinemann and Boschele engaged in a variety of brokerage activities, at all times based upon the express understanding and agreement that Heinemann owned the Trade Secrets.

60.    In furtherance of his plan to profitably utilize the Trade Secrets in his real estate brokerage business, Heinemann incorporated Heinemann, Inc. on September 28, 1999, Lead Generation Systems, Inc. on September 16, 1998 and New Millennium on December 28, 2000. Heinemann, as the sole shareholder and principal officer at all times of Heinemann, Inc. and Lead, utilized them as his agent to effectuate the licensing of the Trade Secrets and the collection of other and related fees and income. Hereinafter, such entities, to the extent that they were so utilized by Heinemann, are incorporated in the party designation "Heinemann."

61. During 2001-2002, Heinemann also granted territorial licenses for use of the Trade Secrets to third party licensees.

62. As an inducement to Heinemann's agreeing to allow Boschele to participate in various business ventures with Heinemann, Boschele orally stated to Heinemann on numerous occasions, including in their joint offices in January 1999, at the time Boschele was hired as Heinemann's personal assistant, and also at the inception of the New Millennium joint enterprise in mid-2002, that Boschele: (a) would honor Heinemann's ownership of the Trade Secrets; (b) would refrain from ever attempting to disclose or to usurp and/or utilize the Trade Secrets for his own personal benefit or in any manner that excluded Heinemann; and (c) would diligently and in good faith apply his best efforts to make their shared ventures successful, to the exclusion of any other opportunities.

63. Heinemann reasonably relied upon Boschele's representations and warranties as aforesaid, by permitting Boschele to participate, acquire ownership and management authority in business ventures that utilized Heinemann's Trade Secrets.

64. At the time of Boschele's making each of the aforesaid representations and warranties, each such representation and warranty was false and/or materially misleading, and Boschele knew it was false or misleading in that he then intended not to honor and abide by it.

**B. The Joint Enterprise of Heinemann, Boschele and Jordan**

65. In early 2002, all Boschele owned was 50% of the shares of Performance Realty University Inc. ("Performance Realty University"), which at that time had a non-exclusive licensing right to use Heinemann's Trade Secrets and intellectual property.

66. In early 2002, Heinemann and Boschele had a competitor, Jordan, whose company, Realty Place, Inc, operated two agency locations, and which had compatible elements of trade dress , as well the slogan, "Your Home Superstore." Jordan expressed willingness to Heinemann to relinquish to Heinemann all rights he or RPI had to with respect to this property, i.e., including the trade dress elements and slogan, so that this property could be used by New Millennium. Jordan at that time also expressed a desire to be relieved of operational responsibilities, in order to focus on other interests outside the real estate industry.

67. After a series of meetings in Charlotte in early to mid-2002, Heinemann, Boschele and Jordan decided to pool their ideas, resources and efforts, and to jointly pursue a new business plan, combining their collective resources and efforts, and based principally upon the use of Heinemann's well-established and proven Trade Secrets and intellectual property.

68. It was agreed between Heinemann, Boschele and Jordan that Heinemann would individually continue to own all of his own pre-existing Trade Secrets and intellectual property, including future improvements, including his Trade Secrets (with certain specified exceptions not relevant here) and that Heinemann, individually, would become the owner of the Realty Place, Inc. trade dress and Slogan, with all of these Trade Secrets and intellectual property licensed, on a non-exclusive basis, to New Millennium. The other assets, of Performance Realty University, Performance Realty, Inc., and Realty Place, were to be transferred to New Millennium. .

69. As a result of the meetings among Heinemann, Jordan and Boschele, it was further agreed that this venture would be conducted through New Millennium, but that it would do business as "Realty Place," and would have a non-exclusive license to

21

use: (1) the slogan "Your Home Superstore" (transferred to Heinemann by Realty Place, Inc,); and (2) the slogans Heinemann had created years earlier, including, inter alia, "98 Special Programs" and "Compare To Rent" (the latter of which was also Heinemann's Internet domain name).

70. In order to effectuate their joint plan, Heinemann agreed to permit Jordan and Boschele to subscribe for an equal number of shares in New Millennium (a corporate entity previously created by Heinemann), such that Heinemann would have a 33 1/3 % equity interest, Jordan would have a 33 1/3 % equity interest, and Boschele would have a 33 1/3 % equity interest—all on the condition that the three individuals enter into and agreed to be bound by a written shareholders' agreement. The consideration provided by Boschele and Jordan included the transfer to New Millennium of all of the assets of Jordan's company, Realty Place, Inc. (except the intellectual property already transferred to Heinemann) and all of the assets of Performance Realty University Inc., the company owned by Boschele and Heinemann. The consideration also included the acknowledgment by Boschele and Jordan that Heinemann retained individual ownership of all of his intellectual property and Trade Secrets (including future versions), together with the newly acquired intellectual property of Realty Place, Inc. Both Boschele and Jordan agreed to this.

71. The parties began their new venture on or about July 1, 2002, and New Millennium added to its operations operated the retail locations formerly run by Jordan through Realty Place, Inc. and by Boschele and Heinemann through Performance Realty University Inc.

72. By the end of 2002, New Millennium developed an inherently distinctive look and feel, unlike any other residential real estate sales company, operated very

successfully and became a successful residential real estate brokerage business in the Charlotte, North Carolina area with six stores, numerous brokers and agents, and substantial revenues.

### C. The Role of Defendant Najjar and LRI

73.     Najjar and LRI were introduced to the Plaintiffs as confidential marketing consultants, and agreed to assist Heinemann in refining his marketing concept for New Millennium while protecting its proprietary nature, and gave express assurances to Plaintiffs that Najjar and LRI would protect the Trade Secrets and proprietary information and that any and all work done for them would have a notification of copyright assigning all rights and interests to Plaintiffs.

74.     Najjar, Heinemann and Jordan specifically discussed that Heinemann owned all of the intellectual property, including but not limited to the advertising, the training, the software, and the phrase "RealtyPlace."

75.     Heinemann gave Najjar digital copies of many of the Trade Secrets on or about May 15, 2002, on the condition that Najjar maintain them in strictest confidence and not utilize them for any purpose other than to advise Plaintiffs.

76.     Najjar agreed to those conditions and Heinemann reasonably relied on Najjar's agreement and assurances in that regard. Najjar further agreed that all materials delivered by Najjar and LRI would bare the designation "©" and New Millennium's trade name, "RealtyPlace."

### D. The 2002 Shareholder's Agreement

77.     On or about December 23, 2002, Heinemann, Jordan and Boschele (the "Shareholders") documented the agreement reached earlier that year, by entering into and executing a shareholders' agreement, entitled "Agreement of Shareholders of New

23

Millennium Realty, Inc. and Universal Mortgage Funding, Inc." (the "Shareholders' Agreement"), a copy of which is annexed hereto as Exhibit A.

78.     Pursuant to the Shareholders' Agreement, in addition to equal ownership in New Millennium, the Shareholders also agreed to equal ownership in Universal Mortgage Funding, Inc. ("Universal"), a second corporate entity already licensed and engaged in mortgage brokerage services, as a complimentary adjunct to their real estate sales business that they were pursuing through New Millennium.

79.     In Paragraph 3(b) of the Shareholders' Agreement, the Shareholders agreed that New Millennium would have:

> A non-exclusive license to the use of the intellectual property ("Property") owned by Heinemann, provided that the Property, including but not limited to, all derivative works, prior versions, source codes, compiled versions, prototypes, and any future versions, and the licensing rights related to such Property, shall continue to be owned by Heinemann individually.

80.     In paragraph 9 of the Shareholders' Agreement, the Shareholders agreed that each would vote his shares such that the officers of New Millennium would be: Heinemann as President, Boschele as Secretary, and Jordan as Treasurer.

81.     In paragraph 11 of the Shareholders' Agreement, the Shareholders, including but not limited to Boschele, agreed that:

> Except for any business in which a Shareholder was engaged prior to the execution of this Agreement and which do not constitute the Business of Corporation [New Millennium] as of July 1, 2002, *no Shareholder may engage in other business ventures* ("Other Ventures"), independently, alone or as a partner, officer, director, member, employee, independent contractor, shareholder, joint venturer or the like, *to the extent that they involve* the ownership, financing, leasing, operation, management, syndication, *brokerage, and development of real property*; any mortgage or insurance agency or operation; any buyer's agency or operation; any listing agency or operation; any apartment locator agency or operation; any credit repair agency or operation; any residential development or building, including the development of raw land, and any other business or operation in which the Corporation may be engaged at the time any Shareholder seeks to become involved with Other Ventures, but only to the extent that such Other Ventures would directly adversely impact the Business of Corporation.

24

[Emphasis added]

82.     At the time of entering into the Shareholders' Agreement, Heinemann was already in the business of licensing his Trade Secrets and intellectual property to third parties.

83.     On or about January 24, 2003, New Millennium hired Killion to act as its controller, to assure reasonable financial checks and balances and compliance with the distribution terms of the Shareholders' Agreement.

84.     Killion agreed to fulfill those functions and the Shareholders agreed that Killian would report to Heinemann and Jordan as well as Boschele, and that Boschele would take charge of day-to-day operations in the main office in Charlotte as its "Director of Operations."

85.     Heinemann and Jordan both had commitments outside the main office of New Millennium, and relied upon Killion and Boschele to act in the bests interests of New Millennium and to report to them and keep them apprised of developments in the business of New Millennium.

86.     Initially, New Millennium's business was highly profitable, and Boschele, Heinemann and Jordan each received substantial distributions of profits.

### E.  The Early Rumors of Boschele's Misconduct and his Denials

87.     In early 2003, Heinemann heard rumors that Boschele: (1) had set up a parallel company and was opening up his own retail real estate brokerage offices in cities where New Millennium intended to expand according to its business plan; (2) was utilizing the Trade Secrets and Plaintiffs' intellectual property in doing so; and (3) was taking payments from licensees of Heinemann's Trade Secrets that should have been paid to Heinemann.

88.     In the corporate office of New Millennium in Charlotte, in early March 2003, Heinemann questioned Boschele about these rumors, but Boschele denied them, insisting that the rumors had been started by disgruntled employees of New Millennium whom Boschele had disciplined and that there was no truth to the rumors at all.

89.     At the time of making the aforesaid statements, Boschele knew that they were false and knew and intended that Heinemann rely on them to his detriment.

90.     Heinemann reasonably relied upon Boschele's disclaimer and assurances.

91.     At this time, pursuant to an agreement among Heinemann, Jordan and Boschele, Heinemann took over responsibility for site selection and growth of Universal, with Boschele to focus exclusively on maintaining and growing New Millennium's business in a new position as Head of Operations.

92.     The cumulative effect of these changes was that Heinemann and Jordan became more reliant on the loyalty and fidelity of both Boschele and Killion.

**F.  The Role of the Independent Contractors**

93.     An essential part of New Millennium's business plan was to selectively and carefully engage, train, monitor and groom key personnel, in particular managers of each location or "store," such that each would follow precisely the business plan and correctly use the intellectual property and Trade Secrets, to which New Millennium had a non-exclusive license from Heinemann.

94.     Correspondingly, as a condition of his or her engagement, each manager was required to sign and in fact did signed an Independent Contractor Agreement, copies of which are annexed hereto as Exhibit B (as to Kelly) and Exhibit C (as to Emmet), providing for a sub-license of Heinemann's Trade Secrets.  It stated in pertinent part that:

> Contractor further agrees that all wireless telecommunications devices, sales tools, advertising, marketing materials, real estate forms, computer programs,

training manuals and materials, mailing and telephone lists, closed clients, ad trackers, leads, and pending contracts (at whatever stage of completion or activity) generated while Contractor provided Services to Company shall remain the exclusive property of Company, and, in the event of the termination of this Agreement, voluntarily or involuntarily, where applicable, Contractor agrees (1) to return to Company any such items in the possession, custody or control of Contractor; and (2) without the prior written consent of Company, to not copy, lend, or otherwise disseminate any such items and to not remove any such items from the premises of Company; and Contractor shall read and abide by the Policies and Procedures Manual as issued by Company and as amended from time to time. (¶ 4 (j), (k).

95. In order to further prevent the unauthorized disclosure or use of the Plaintiffs' intellectual property (including the Trade Secrets), each Independent Contractor Agreement further provided that:

### G. Confidential Information and Intellectual and Other Property.

(a) All information related to prospects and clients, and all good will associated therewith, is, and shall continue to be, the exclusive property (collectively, "Property") of Company, both during and after the termination of this Agreement. Contractor specifically acknowledges that Contractor has no ownership interest or rights of any kind in or to such Property. Contractor further agrees and specifically acknowledges that all leads and contacts obtained or made by Contractor with new or prospective clients (together, "Clients") while performing under this Agreement shall also be deemed to be the Property of Company;

(b) Contractor expressly acknowledges that: (i) Company is engaged in a personal service business ("Business") involving confidential information concerning Company's internal operations, and certain personal and Business information (collectively, "Information") related to Clients and Company's relationships with Clients, and (ii) the success of Company's Business is due in large part to the exclusive retention of such Information and the undisturbed continuation of such personal relationships with Company's Clients. Therefore, Contractor acknowledges that the Information (defined herein below) is the sole and exclusive property of Company (or a third party providing such Information to Company). Contractor acknowledges and agrees that the disclosure of the Information to Contractor does not confer upon Contractor any license, interest or rights of any kind in or to the Information. Contractor may use the Information solely for the benefit of Company and only while Contractor is engaged by Company. Except in the performance of Services for Company, Contractor will hold in confidence and not reproduce, distribute, transmit, reverse engineer, decompose, disassemble, or transfer, directly or indirectly, in any form, by any means, or for any purpose, the

27

Information or any portion thereof. Contractor agrees to return to Company at any time, upon request by Company, the Information and all materials relating thereto;

(c) As used in this Agreement, Information means information, including trade secrets ("Trade Secrets"), that is of value to Company and is treated as confidential; provided, however, that Contractor shall not be restricted from disclosing or using Information that Contractor affirmatively establishes: (i) is or becomes generally available to the public other than as a result of an unauthorized disclosure or (ii) is required to be disclosed by law, court order or other legal process; provided, however, that in the event disclosure is required by law, Contractor shall provide Company with prompt notice of such requirement so that Company may seek an appropriate protective order prior to any such required disclosure by Contractor. Information may include, but not be limited to, the identity of and information describing actual or prospective Clients, renewal dates of any policies involving clients, commission rates, methods or plans used by Company to carry on its Business, including, but not limited to, marketing techniques, marketing materials and the Company Policies and Procedures Manual;

(d) Upon termination of this Agreement, Contractor shall surrender and otherwise disclose to Company all Information and Trade Secrets in his possession, including, but not limited to, all lists, charts, schedules, reports, financial statements, books and records, computer passwords, computer back-up tapes, including all copies thereof, whether in tangible or computer readable form. Additionally, Contractor shall surrender to Company all computer hardware and programs, furnishings, sales tools, advertising, training manuals and materials, marketing materials, closed clients, add trackers, leads, mailing lists and any other property provided to Contractor by Company in furtherance of this Agreement; and

(e) The obligations of Contractor set for in this Section 8 shall survive the termination of this Agreement.

(§ 8, entire).

96.     As the "Director of Operations" in charge of the day-to-day operations of the main office of New Millennium, and as a principal officer and director of New Millennium, Boschele had a duty to ensure the enforcement of the Independent Contractor Agreements on the part of all affected personnel.

97.     However, instead of enforcing the Independent Contractor Agreements for the benefit of New Millennium, Boschele was actively encouraging and personally

benefiting from their breach, by retaining the independent contractors to serve his Shadow Companies.

98.  Emmet, Kelly and others whose names are unknown to Heinemann at this time, executed Independent Contractor Agreements with New Millennium, containing the foregoing terms and conditions, accepted valuable consideration in connection therewith, and are still under contract with New Millennium.

## H.  **The Defendants' Overall Scheme**

99.  Beginning at approximately the same time as the inception of New Millennium's operations, Boschele, Natalie Boschele, Killion, Emmet, Kelly, LRI and the Does, plotted to misappropriate Plaintiffs' Trade Secrets and other intellectual property and to convert New Millennium's corporate funds, profits and opportunities, in part by setting up through the Shadow Companies' copycat stores for their own personal benefit, to Plaintiffs' great harm.

100.  Boschele induced key personnel, including Emmet and Kelly, to abandon their positions with   New Millennium and to operate his clandestine stores in direct competition with New Millennium's targeted expansion locations, using the Plaintiffs' Trade Secrets and other intellectual property without authorization or payment, and in a manner that constituted flagrant violations of the Shareholders' Agreement and Independent Contractor Agreements and   North Carolina and federal law, effectively foreclosing several lucrative markets within New Millennium's natural zone of expansion.

101.  Boschele essentially copied the Plaintiffs' Trade Secrets and trade dress, sought and obtained funding for his new venture from an investor and duplicated New

Millennium's business plan for his own benefit and to the exclusion of Heinemann and Jordan.

102.     Upon information and belief, Boschele and those acting in concert with him including upon information and belief Natalie Boschele transferred and misappropriated assets belonging to or ultimately recoverable by Plaintiffs to third parties, to impair or defeat the rights of lawful creditors, such as Plaintiffs, in the event the improper actions of Boschele and those acting in concert with him were later detected and prosecuted.

**I.     The Creation of Other Entities in Violation of the Shareholders' Agreement and the Fraudulent Federal Registration of Service Marks.**

103.     Boschele formed Your New Home Realty on January 8, 2003, and Your Home Superstore, Inc. on March 6, 2003, for the specific purpose of illicitly foreclosing the expansion of New Millennium and unfairly competing against Plaintiffs with the Plaintiffs' own Trade Secrets and other intellectual property.

104.     On or about March 6, 2003, in furtherance of the illegal schemes of BSI and its principals, Boschele and Natalie Boschele, and those acting in concert with them, BSI by and through an agent and attorney-in-fact applied for United States service mark registration and protection for the term "Your Home Superstore" (serial number 78222428), a term long in use by Jordan and RPI and assigned to Heinemann for use by New Millennium.

105.     Also on or about March 6, 2003, in furtherance of Boschele's illegal schemes, BSI and its principals, including Boschele and Natalie Boschele, by and through their agent and attorney-in-fact, applied for United States service mark registration and protection for the term "Compare To Rent" (serial number 78222420), a

30

term in use since at least 1996 and licensed by Heinemann to New Millennium on December 23, 2002. Collectively the applications are referred to as the "Applications."

106. In the course of making each of the Applications, BSI through Boschele and its agents were required to make and in fact made the following certification:

> The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the **applicant to be the owner of the trademark / service mark sought to be registered**, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes **applicant to be entitled to use such mark in commerce**; to the best of his/her knowledge and belief **no other person, firm, corporation or association has the right to use the mark in commerce**, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

[emphasis added]

107. By Notice of Allowance dated February 3, 2004, the United States Patent and Trademark Office advised BSI and its principals, including Boschele and Natalie Boschele, that they were required to file a Statement of Use within 6 months (not later than August 3, 2004) for the term "Your Home Superstore".

108. In response to the Notice of Allowance, on July 29, 2004, BSI and its principals, including Boschele and Natalie Boschele, filed a Statement of Use for the term "Your Home Superstore".

109. In the aforesaid Statement of Use, BSI and its principals, including Boschele and Natalie Boschele, made the following certification:

> The mark was first used by the applicant, or the applicant's related company, licensee or predecessor in interest at least as early as 04/30/2003, and first used in commerce at least as early as 07/03/2003,

31

and is now in use in such commerce. The applicant is submitting one specimen for the class showing the mark as used in commerce on or in connection with any item in the class, consisting of a(n) photograph of the mark as used in connection with the services. [attached as the specimen for "Your Home Superstore" was a photograph of the sign outside one of Defendant's rogue retail locations]

**Applicant [BSI] is the owner of the mark sought to be registered...**

The undersigned being hereby warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements and the like may jeopardize the validity of this document, declares that he/she is properly authorized to execute this document on behalf of the Owner; and all statements made of his/her own knowledge are true and that all statements made on information and belief are believed to be true.

[emphasis added].

110. The above statement of use was materially false, as Boschele and those acting in concert with him knew then that "Your Home Superstore" was a service mark previously used by New Millennium, as a component of Heinemann's intellectual property.

111. By Notice of Allowance dated February 3, 2004, the United States Patent and Trademark Office advised BSI and its principals, including Boschele and Natalie Boschele, that they were required to file a Statement of Use within 6 months (not later than August 3, 2004) for the term "Compare To Rent"

112. Solely due to the growing revelations about their fraudulent schemes, BSI, Boschele and those acting in concert with them, failed to timely file a Statement of Use for the service mark "Compare To Rent," and the United States Patent and Trademark Office issued a Notice of Abandonment on September 22, 2004.

113. In the aforesaid application, BSI at the direction of and through its agent Boschele and those acting in concert with him, were committing perjury and violating 18 U.S.C. §1001, in that by the aforesaid certifications, because they knew that Plaintiffs

owned all rights to the phrases "Your Home Superstore" and "Compare To Rent" and that those phrases had been used in commerce for several years before BSI, Boschele and those acting in concert with them, surreptitiously and fraudulently filed the aforesaid applications and Statement of Use, began using such terms in the identical business in New Millennium's natural zone of expansion, and despite the fact that they had countless other possible terms they could have used, that would not have confused consumers -- evidence of their intent to trade on the good will developed over many years by the plaintiffs at a great expense.[2]

114.    In reliance on the false statements in the application and the statement of use, the United States Patent and Trademark Office eventually issued Service Mark Registration Number 2,926,917 on February 15, 2005 to BSI for "Your Home Superstore" for "real estate sales and services, namely, real estate brokerage services, real estate agency services, and real estate listing services."

### J.  The Peculiar Role of Killion

115.    Unbeknownst to Heinemann and Jordan, Boschele had hired Killion first to work for the Shadow Companies and was simultaneously on the payrolls of  New Millennium and Your New Home Realty.

116.    Both Boschele and Killion failed and/or refused to disclose that fact to Heinemann and Jordan, leaving them with the impression that they could expect undivided loyalty, no conflicts of interest, and impartial reporting from Killion.

117.    However, Boschele's and his colleagues' deception succeeded in concealing and perpetuating Boschele's schemes at a critical time for the business of

---

[2]    Of course, they were not permitted to engage in such activities in the first place, because of the restrictions set forth in the Shareholders' Agreement and Independent Contractor Agreements.

New Millennium, when its potential expansion and profitability were enormous, as Boschele himself well knew and intended to exploit, to Plaintiffs' great harm.

### K. The Discovery of the Greensboro "Your New Home Realty" Store.

118.    In early April 2003, Heinemann went to one of the projected expansion locations for New Millennium, the Four Seasons Town Centre Mall in Greensboro, North Carolina.

119.    During his trip to Greensboro, Heinemann found a real estate sales agency using the name "Your New Home Realty," which had been surreptitiously set up by Boschele and Kelly, New Millennium's then manager at its Concord Mills Mall location in Concord, North Carolina.  This "Your New Home Realty" store was nearly identical New Millennium's store concept and duplicated its trade dress.

120.    At the Greensboro "Your New Home Realty" store, Heinemann picked up a "Your New Home Realty" brochure, virtually identical to New Millennium's, and which embodied Plaintiffs' intellectual property, including photographs Heinemann himself had taken that had been on the computer files loaned to Najjar and LRI, who were well-aware that the Trade Secrets were owned by Heinemann and licensed to New Millennium, and that New Millennium's intellectual property was an important asset of the company not to be used for any purposes other than New Millennium and not to be disclosed or used by competitors.

121.    During his visit to Greensboro, in conversations that Heinemann had wit h agents in the Greensboro "Your New Home Realty" store, they recited verbatim marketing quotes and scripts that Heinemann had personally developed as sales tools included in the Trade Secrets licensed to New Millennium.  Attempting to establish credibility, the agents told Heinemann "you have probably seen our store in Concord

Mills" (the only similar agency in Concord Mills being New Millennium's own store concurrently managed by Kelly), and "we started *our business* several years ago in Charlotte" (the location of New Millennium and its predecessors). Your New Home Realty and Your Home Superstore, Inc. had been formed one to three months earlier). They further told Heinemann that "we have 9 locations, a statement that could only have meant that they included New Millennium's pre-existing locations, further evidence of their intent to trade on the goodwill developed over many years by Heinemann and New Millennium at great expense.

122.     With the exception of these falsehoods, the quotes and scripts used by the agents in speaking to Heinemann were substantially identical to those he himself had developed for approaching new prospects and were part of his Trade Secrets of which he had given only a non-exclusive license to New Millennium.

123.     Heinemann confronted Kelly, who had entered the Greensboro store after Heinemann and was clearly its manager.  Kelly said to Heinemann, "I told Kris to work this out with you."  He acknowledged that he and Boschele knew they were violating Plaintiffs' legal rights, had in effect stolen Heinemann's Trade Secrets and New Millennium's intellectual property and corporate opportunities, and that he was violating the terms of his Independent Contractor Agreement with New Millennium.  However, Kelly stated that he [Kelly] hoped they could resolve the issue without more serious ramifications, in part by paying an appropriate license fee and royalties.

124.     Heinemann then telephoned Boschele, who denied that there was a Greensboro shadow agency until Heinemann told him that he had just left it, and then Boschele told Heinemann that he [Boschele] had "planned to tell Heinemann about it and pay Heinemann licensing fees and royalties."

35